## Bonaduce, Appellant, *v.* Transcontinental Gas Pipe Line Corporation.

Argued June 8, 1959. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*William L. McLaughlin,* for appellant.

*Frank R. Ambler,* for appellees.

OPINION BY HIRT, J., September 16, 1959:

This is a workmen's compensation case; claimant had been in the employ of Transcontinental Gas Pipe Line Corporation since 1951; he was promoted on October 1954 to the job of "auxiliary engineer". His ordinary duties consisted in "reading charts, placing charts, wiping, light work on engines and reporting pressures" to his superior. We will refer to these units of machinery as engines, as they are called in this record, although they in fact probably were compressors. Claimant's duties also included keeping "Station 20", which housed the machinery, clean and in order. The job involved heavy work only occasionally, except during a period of 8 days in each year when his employer overhauled the six engines at this plant. Year after year claimant with his consent, voluntarily, by election, became a member of the group assigned to the work of tearing down the engines, removing the pistons and reassembling the parts after the overhaul. Each year the work schedule was the same. To complete the operation within the alloted period, workdays of 12 hours each were imposed. There were rest periods, however, and times out for food.

Claimant's principal work consisted in helping remove the rings from the pistons, each weighing about 2 pounds, and cleaning them on an electric buffer. Most of claimant's time was spent on this light work.

Dismantling the engines and reassembling them after the overhaul involved some heavy work. Claimant with a fellow employe, working from a cat-walk "up on the engine about 7 or 8 steps" removed the bolts from the head over the pistons by means of an electric air wrench weighing between 35 and 40 pounds. And after the pistons were re-installed and "after the engine runs" it was claimant's responsibility to check the bolts, we assume to see that they were screwed down tight, by means of the electric wrench held chest high by the workman. This operation had been completed by claimant with a helper on four of the engines. In the late afternoon of June 8, 1955, the eighth and last day of the overhaul job claimant alone was working on the fifth engine. While checking the bolts with the air wrench he felt a sharp pain across his chest. He thought he "must have torn a muscle apart" but he finished his assignment on that particular operation working at a slower pace. The next day he returned to his general duties and worked until June 14 when he suffered another severe attack, following intermittent periods of pain in a lesser degree. He then consulted his family physician, Dr. Andrew J. Lotz, a general practitioner, who concluded that there was a "strong probability that this man was having coronary trouble" and he had him admitted to a hospital for further study.

The referee initially found that claimant was not entitled to compensation on the conclusion that his disability "was the result of natural causes and had no relation to his work." In its opinion filed one year later the board on appeal indicated that it had concluded that claimant was entitled to compensation.

And the board remanded the case to the referee for the single "purpose of hearing testimony offered by claimant and defendant as to the degree of claimant's disability, if any, subsequent to November 26, 1956, when he began work following his accident and injury." The referee after the remand hearing awarded compensation for reasons which are apparent, and the board affirmed. The lower court however reversed on a question of law as to whether the findings are supported by the evidence (*Monahan v. Seeds & Durham,* 336 Pa. 67, 6 A. 2d 889) and entered judgment for the defendant.

This work was not new to the claimant. During the 8-day overhaul period in each year, beginning with 1951, claimant for 4 consecutive years, with his consent, had made this overhaul operation his regular work. As far as the record discloses his part in the work was the same every year. He operated the wrench "lots of times before [although] only momentarily" between overhaul periods. And he admitted that at the time he "felt this pain" he was "using it [i.e., the mechanical wrench] the same way [he] always used it." Even work calling for unusual effort in the course of employment does not necessarily constitute overexertion within the meaning of the Workmen's Compensation Law. Where labor, though hard, is of the same kind and done in the same manner that it has been performed for years, disability from the exertion does not constitute an accident. *Sadusky v. Susq. Collieries Co.,* 139 Pa. Superior Ct. 595, 12 A. 2d 828. The doing of an occasional act involving sustained muscular effort may be part of the usual duties of a workman but, though the work is hard, if it is of the same kind and quantity and done in the same manner as it has been performed in the past, disability resulting from exertion does not constitute an accident. *Dolinar v. Pittsburgh Terminal Coal Co.,* 140 Pa. Superior Ct. 543, 14 A. 2d 871, and particularly the authorities cited on page 546.

In our view claimant has not met the burden upon him of showing accident from overexertion. But even if we assume an accident, as did the lower court, disability from accident was not established by plaintiff's testimony even when viewed in the light most favorable to him. Plaintiff's medical witness, Dr. Lotz, when asked: ". . . do you have any opinion as to the cause of the onset of this attack . . ." testified: "Well, yes I do. It is common knowledge that coronary attacks can be preceded by conditions of unusual strain, . . . In view of the fact he did have unusual strain, it was one of the factors that led me to conclude that there was a *strong possibility* that he was having coronary attacks." And then: "Q. Would you say this attack was induced by the overexertion, in your opinion? A. That was my conclusion *from the story he told me.* . . . A. My opinion as I expressed it various other times was that the spell—now, I can't be absolutely sure of these things. Q. Well, what is the most probable? A. The spell *could have been induced by overexertion. It probably was."* (The italics throughout the quotations from his testimony are ours). The witness also testified that coronary disease is progressive and that claimant's heart condition alone could have caused the disability. But when asked to "distinguish whether this attack came from stress and strain or from the normal progress of an arteriosclerotic condition" he said: "That is an impossibility." On this phase the burden was on claimant to make out a case by unequivocal medical testimony. *Monahan v. Seeds & Durham,* supra (a leading case); cf. *Lorigan v. W. O. Gulbranson, Inc.,* 184 Pa. Superior Ct. 251, 132 A. 2d 695. In *Tabuteau v. London G. & A. Co., Ltd.,* 351 Pa. 183, 185, 40 A. 2d 396, (referring to *Fink v. Sheldon Axle & Spring Co.,* 270 Pa. 476, 113 A. 666; *McCrosson v. Phila. Rapid Transit Co.,* 283 Pa. 492, 129 A. 568; *Anderson v. Baxter,* 285 Pa. 443, 132 A.

324

358; *Vorbnoff v. Mesta Machine Co.*, 286 Pa. 199, 133 A. 256), Mr. Justice Drew, speaking for the court, said: "In those cases expert testimony was relied upon to show that a given result came from an assigned cause, and it was uniformly held that expert witnesses would have to testify, not that the condition of claimant *might* have, or *could* have, or even *probably did* come from the accident, but that 'it is their professional opinion the result in question most probably came from the cause alleged.' "

Claimant did not meet the burden upon him of showing disability from accident.

Judgment affirmed.