661 A.2d 1379

Natawadee STEINHOUSE, M.D., and
Roy Steinhouse, H/W, Appellants,

v.

HERMAN MILLER, INC., and St. Agnes Medical Center.

Superior Court of Pennsylvania.

Argued April 26, 1995.

Filed June 13, 1995.

Reargument Denied Aug. 18, 1995.

8. Appellee's outstanding motions to quash, dismiss and/or strike are denied.

William D. Marvin, Bensalem, for appellant.

Anne Mauero, Philadelphia, for Herman Miller, Inc., appellee.

Nancy L. Siegel, Philadelphia, for St. Agnes Medical Center, appellee.

Before TAMILIA, SAYLOR and HOFFMAN, JJ.

TAMILIA, Judge:

Appellants, Natawadee Steinhouse and her husband Roy Steinhouse, appeal the October 11, 1994 entry of judgment on a jury verdict in favor of appellees.

This case was initiated after appellant/wife, a family practice physician, fell from a chair at St. Agnes Medical Center (St. Agnes) and was allegedly injured. Appellants brought a products liability suit against the chair manufacturer, Herman Miller, Inc., and a negligence suit against St. Agnes, alleging a dangerous condition of land. Appellees conceded that appellant/wife was a business invitee of St. Agnes. Following trial, the jury returned a verdict in favor of both appellees, finding that the chair was not defective and that St. Agnes was not negligent.

On appeal, appellants do not contest the verdict as to the chair manufacturer, choosing instead to assign as error two rulings of the trial court regarding St. Agnes. Initially, appellants assert that the trial court's failure to adequately instruct the jury on the duty owed by St. Agnes to a business invitee constitutes reversible error. Appellants had requested the following charge:

31. A possessor of land is subject, such as St. Agnes Medical Center, is subject [sic] to liability for physical harm caused to their invitees, such as Dr. Natawadee Steinhouse, by a condition of the land if, but only if they

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that the invitees would not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

Plaintiffs' Proposed Points for Charge No. 31.

The trial court charged, in relevant part, as follows:

The duty issue is not in dispute here. It's no question that St. Agnes Hospital would owe a duty of reasonable care to all the parties who would go on the premises; doctors, nurses, visitors, patients.

Did they breach that duty by acting or failing to act as a reasonable and prudent hospital would under the particular circumstances of the particular case?

. . . . .

In analyzing whether they were negligent or not involving this chair, you have to decide these two things: did the chair present an unreasonable risk of harm to the users; the people that would sit on it?

If you answer that question, yes, then you have to decide, if that were so, did the hospital know or have reason to know about this fact? They are the two areas of inquiries you should make in determining whether or not St. Agnes Hospital was negligent.

(N.T., 4/25/94, pp. 169–170.) [1]

██ Specifically, appellants contend that the phrase "reason to know" as used by the court below is only applicable to cases involving "mere licensees" and did not appraise the jury of St. Agnes' affirmative duty to inspect for dangerous conditions (Appellants' brief at 19). Appellants' proposed point for charge No. 31, quoted above, is taken verbatim from Restatement, Torts, 2d, § 343, which is entitled "Dangerous Conditions Known to or Discoverable by Possessor." Appellants are entirely correct in their assertion that section 343 establishes a duty of inspection owed to invitees. However, as section 343(a) indicates, the duty applies only to conditions that involve "an unreasonable risk of harm to such invitees." Since the jury found that the chair did not present an unreasonable risk of harm, the duty of inspection, as it relates to the chair, never arose. Thus, any error in the trial court's charge concerning duty was harmless.

The trial judge's charge discussed the following special interrogatories, as submitted to the jury:

The first two questions deal with the liability of the chair manufacturing company, Miller. Was the chair defective?

1. Unless otherwise noted, all references to the testimony are from the transcript of April 25, 1994.

> If you answer that, no, your inquiry ends, as far as Miller is concerned.
>
> If you answer it, yes, you've got to go to the causation question. Miller would be found liable only if you answered both of those two questions that there was a defect, the defect caused the accident. Yes.

(N.T. at 159.) The judge then defined "defect" as follows:

> What is a defect? A defect occurs in a product when it contains a condition or lacks an element that makes it *unsafe for its reasonably intended use.*
>
> In this case, what you have to ask yourself is: was this chair defective? Did it contain a condition or lack an element that made it *unsafe for its reasonably intended use?* That's what you have to decide in determining whether or not the chair was defective.

(*Id.* at 168 (emphasis added).)

The jury's determination that the chair was not defective, therefore, manifested its belief that the chair was not "unsafe for its reasonably intended use." We find no reason to distinguish this definition, as relied on by the jury, from the definition of dangerous condition contemplated by section 343(a), namely, "[a condition] that involves an unreasonable risk of harm." In short, under the facts of this case [2] a chair that is not "unsafe for its reasonably intended use" does not involve "an unreasonable risk of harm."

Appellants, in their reply brief, contend that the two definitions are not interchangeable because defectiveness is gauged at the time the chair leaves the manufacturer's possession, whereas the negligence of the hospital in allowing this "worn-out" chair to be used on a hard-tile floor must be gauged when the injury occurred (Appellants' reply brief at 9). Specifically, appellants assert that since St. Agnes' negligence lies in using this chair "under conditions existing many years later and unknown to the manufacturer," a finding that the chair was

---

**2.** As will be discussed, infra, there is no evidence the condition of the chair was materially altered subsequent to its sale by the manufacturer.

not defective when sold does not insulate the medical center from liability (Appellants' brief at 8).

Appellants' contentions that the condition of the chair somehow changed after sale and that use of the chair on a tile floor was a fact "unknown to the manufacturer," both offered for the first time during this litigation, are so explicitly belied by appellants' own pleadings and trial strategy that we find them to be disingenuous. As to appellants' first contention, Court III of appellants' complaint, sounding in product liability against the chair manufacturer, states:

16) The aforesaid chair was in substantially the same condition at the time of the accident as it was at the time it left Defendant's possession and control.

Averments in pleadings constitute binding judicial admissions, conclusive in their nature insofar as their effect is confined to the case in which they are filed. *Hutchison Enterprises v. Data Basics East, Inc.,* 345 Pa.Super. 91, 497 A.2d 659 (1985). Moreover, virtually the entire thrust of the expert testimony offered by appellants, "which went both to the inherent stability of the chair, as well as its suitability for the use given it by St. Agnes," was that the castors on the chair were dangerous (Appellants' brief at 8). Therefore, the linchpin of appellants' entire case, asserted as the basis of liability of *both* defendants, hinged on the fact that the castors were *not* changed to accommodate the chair's use on a tile floor. Appellants may not now present a new theory of their case simply because the former theory failed to persuade the jury.

Undermining appellants' second contention (that use of the chair on a tile floor was "unknown to the manufacturer") is the fact that a necessary requisite of appellants' product liability claim was that the injury was a foreseeable consequence of the manufacturer's conduct. Indeed, Count II of appellants' complaint is based on:

e. failure [of the manufacturer] to exercise due and reasonable care under the circumstances in view of the foreseeable dangers and/or foreseeable accidents and inju-

ries that could occur from using said chair, particularly with regard to the use of dangerous wheels on said chair[.] Thus, a claim of imputed knowledge of foreseeable injuries was necessary to appellants' case against the manufacturer. Now that the claim has failed, appellants cannot on appeal aver the contrary to bolster their case against St. Agnes.

In sum, appellants failed at trial to aver or prove any changed conditions or unexpected use by St. Agnes which would justify a distinction between the time of sale of the chair and the time of injury. To the contrary, the evidence presented demonstrated that the chair did not undergo substantial change which contributed to appellant/wife's injury and that use of the chair on tile was foreseeable by the manufacturer.[3] Therefore, because no change in condition or unforeseeable use was proven, we find that the chair, determined to be reasonably safe when it left the manufacturer's possession, continued to be reasonably safe, within the meaning of section 343, at the time Dr. Steinhouse was injured. Pennsylvania Courts will not presume defects.

We find additional support for the conclusion that appellants failed to prove the chair was unreasonably dangerous in the case of *Kramer v. Meyer*, 168 Pa.Super. 13, 76 A.2d 481 (1950). In *Kramer*, the finger of a minor business invitee became caught in the hinge of a step ladder upon which the plaintiff was attempting to sit. The plaintiff brought suit against the store owner upon the identical theory advanced by appellant here. In affirming a compulsory nonsuit for defendant, our Court held:

It does not follow from the fact of the injury in this case that the ladder was a dangerous instrumentality.... That burden of proof was on the plaintiffs.

. . . . .

Here, so far as disclosed by the testimony, the instrumentality which caused the injury was a small folding stepladder of the ordinary conventional type. As such it was no more

---

3. Indeed, the manufacturer's expert testified that "[i]t was appropriate to use this chair on [tile]." (N.T., 4/25/94, p. 84.)

dangerous that a folding chair or other folding device in common use.

*Id.* at 15–16, 76 A.2d at 482.

The fact that appellants, apparently unlike the plaintiff in *Kramer,* presented expert testimony that the chair from which Dr. Steinhouse fell was in fact dangerous does not alter our conclusion that appellants failed to prove that the chair was a dangerous condition of land. The testimony of appellants' expert was rebutted by the testimony of appellee's expert that the chair was suitable for use on tile. The jury resolved this conflicting expert testimony in favor of appellee and we will not disturb its determination on appeal. *Junge v. Garlock, Inc.,* 427 Pa.Super. 592, 629 A.2d 1027, *appeal denied,* 537 Pa. 610, 641 A.2d 310 (1993).

Since appellants failed to prove that the chair was unreasonably dangerous, St. Agnes owed no duty of inspection to appellants with regard to the chair. Thus, any error in the jury charge concerning duty was harmless.[4]

Appellants next contend "the trial court abuse[d] its discretion by allowing the hospital defendant to effectively introduce affirmative evidence through cross-examination of the other defendant's expert, while depriving the plaintiffs of their right to make the final rebuttal closing speech" (Appellants' brief at 3). Appellants' basis of appeal, which actually presents three issues for our review, stems from the following cross-examination of the manufacturer's expert, Tom Ankey, by counsel for St. Agnes:

Q. [Counsel for St. Agnes] Will you agree with me that the chair as it's here today, it was appropriate to use that chair on that particular floor surface?

[Objection]

[Overruled]

Q. It was appropriate to use this chair on the surface—the floor surface that was described in the nurse's station?

4. We neither assume nor decide that the charge was erroneous.

A. [Manufacturer's Expert] A chair outfitted with CA casters is appropriate to use on tile or carpet.

Q. And you've had a chance to look at the chair during the course of this trial?

A. Yes.

Q. To examine the chair?

A. Yes.

Q. Did you find that there was any unreasonable risk of harm presented by that chair?

THE WITNESS: No. The chair is in good shape. Everything is in working order. I don't see any risk with that chair at all.

(N.T. at 84–85.)

Appellant initially objects to this testimony as exceeding the scope of both the manufacturer's direct examination and the appellant's cross-examination.

The manufacturer's expert testified on direct examination as follows:

Q. With respect to the CD Casters that were on the chairs that was sold to St. Agnes, what derometer reading under the Shore D scale did they have?

A. Those casters fall right around the forty range.

Q. In terms of applicability to the type of surface, how could St. Agnes utilize that type of chair?

A. In the price book, the caster options all have a description. It talks about the sizes of caster a number of wheels and whatever else might be in there. Then we also talk about the floor surface. Why a caster is acceptable for use on either hard floors or carpeting.

(*Id.* at 63.)

Q. Finally, Mr. Ankney, Do you have an opinion as to whether this chair line is stable and meets the A.N.S.I. requirements for stability?

A. Yes I do.

Q. What is that opinion?

A.  My opinion is the chair meets and exceeds all existing stability requirements. And, in fact, the performance of the chair from a stability standpoint is quite acceptable and doesn't pose an unreasonable risk.

(*Id.* at 66.)

Subsequently, the expert testified on cross-examination by appellants as follows:

Q.  Would it be fair to say that it's a middle of the road type caster in terms of suitability for both hard and carpeted floors?

A.  Performance is such that it provides acceptable performance on either hard floors or soft floors, carpeted floors.

Q.  That's because as you testified, it falls somewhere—and I don't want to misquote you. "Casters fall right around the forty range?"

A.  Right.

Q.  Which is right in the middle between used for hard and carpeted floors.

A.  That's correct.

(*Id.* at 80.)

A trial judge has considerable latitude in determining the scope of cross-examination and his determination will not be reversed in the absence of an abuse of discretion unless a party suffers an obvious disadvantage. *Tolomeo v. Harmony Short Line Motor Transp. Co.,* 349 Pa. 420, 37 A.2d 511 (1944). Here, the door had been opened as to the suitability of the chair to tile flooring by both the manufacturer and appellants. As the testimony elicited by St. Agnes essentially reiterated and clarified previous testimony, its admission was not in error. Additionally, the cross-examination of the manufacturer's expert by St. Agnes was proper because it sought to rebut the inference, raised both by the manufacturer and appellants, that St. Agnes was somehow negligent in choosing the chair in question.

On direct examination by the manufacturer, the expert testified as follows:

Q. Given all the various features that you talked about to the jury; the height adjustment, tilt feature, in a customer such as St. Agnes Hospital, who would determine the type of chair that would be provided to the customer?

A. That's typically a give and take discussion with a customer and somebody who might be representing our product, a dealer representative. It's real similar to going into a car dealer and you trying to pick out the things you want on a brand new car. It's the same type of thing with chairs.

(N.T. at 58–59.)

Q. Now, it indicates on that, that there are a number of options offered on that particular page of the chair that was purchased by St. Agnes; correct?

A. Yes.

(*Id.* at 59.)

Q. This type of chair is depicted with glides as opposed to the casters; correct?

A. Correct.

Q. That was an option that St. Agnes could have ordered with this chair as opposed to the casters; correct?

A. Yes. ...

(*Id.* at 60.)

Plaintiffs' attorney then cross-examined the expert as follows:

Q. Now, you testified that—and I don't want to misquote you—that when the chairs are purchased, there is a give and take between the dealer who represents the line of chairs and the person who wants to purchase them?

A. In some cases, yes.

Q. It's ultimately, from what I gather, the consumer's responsibility to choose what type of chair they want; is that correct?

A. When you say, consumer, you mean the people purchasing the chair?

Q. Yes.

Q. From your testimony, its up to the consumer or the person purchasing the chair to decide whether they want a GD Caster or a CA Caster?

A. The ultimate decision is the person making the purchase.

(*Id.* at 73–74.)

██ Thus, as this testimony clearly raises the inference that it was St. Agnes' responsibility to choose an appropriate chair, St. Agnes was well within its rights to elicit testimony, via cross-examination, that the chosen chair was, in fact, appropriate. Indeed, the very purpose of cross-examination is to elicit testimony tending to refute all inferences and deductions raised by direct examination. *Rafter v. Raymark Industries, Inc.,* 429 Pa.Super. 360, 632 A.2d 897 (1993).

Appellants next claim that since St. Agnes offered "affirmative evidence" during cross-examination, it was improperly allowed to deliver the final closing speech (Appellants' brief at 31). Specifically, appellants assert a violation of Philadelphia Civil Rule 223.1(D), which states:

(D) After the evidence is closed, only one attorney for each party or group of parties may address the jury. The attorney for the party or group of parties having the burden of proof shall first sum up, stating explicitly the grounds relied upon. The attorney for each adverse party or group of parties may then address the jury, and, if any such party has offered evidence, the attorney who commenced may conclude, restricting himself or herself to answering the arguments advanced.

██ Both parties agree that this rule provides that a party who offers no evidence at trial is to be given the final opportunity to address the jury. In light of our determination

that cross-examination of the manufacturer's expert by St. Agnes was proper, the testimony presented was not the admission of affirmative evidence. *Commonwealth v. DePofi,* 362 Pa. 229, 66 A.2d 649 (1949), *cert. denied,* 338 U.S. 852, 70 S.Ct. 82, 94 L.Ed. 522 ("Admission of evidence" refers to admission of affirmative evidence in chief, and not to what may be asked of a defendant on cross-examination). Appellants' contention is therefore without merit and St. Agnes was properly permitted to deliver the final speech.

■ Lastly, appellants claim St. Agnes' introduction of expert testimony via the above-quoted passage, "under the guise of cross-examination," unfairly surprised and prejudiced appellant (Appellants' brief at 30). We reject this contention for several reasons. Initially, Mr. Ankey was the expert for the manufacturer, a party which, as noted, maintained a position potentially adverse to that St. Agnes. Therefore, the examination of Mr. Ankey was not, as appellants suggest, "friendly." Further, Mr. Ankey was clearly identified prior to trial as an expert who would testify for the manufacturer. Appellants also received Mr. Ankey's expert report which expressed the opinion that the chair in question "would be acceptable for use on hard floors." Thus, since appellants were aware of the expert's identity, as well as the substance of his testimony prior to trial, we fail to see how appellants were surprised or prejudiced by the testimony elicited during St. Agnes' legitimate cross-examination of Mr. Ankey. *See e.g., Feingold v. SEPTA,* 512 Pa. 567, 517 A.2d 1270 (1986) (no prejudice exists where appellant knew identity of expert and knew the substance of his testimony, despite failure of party offering the testimony to list expert in pretrial statement).

Based on the foregoing discussion, we affirm the judgment of the trial court.

Judgment affirmed.