Rima YACOUB, Administratrix of the Estate of Bashar Yacoub, Deceased, Appellant,

v.

LEHIGH VALLEY MEDICAL ASSOCIATES, P.C., Margaret S. Tretter, D.O., James T. McNelis, D.O., Allen Neurosurgical Association, Inc., Zev Elias, M.D., and Lehigh Valley Hospital, Appellees.

Superior Court of Pennsylvania.

Argued Nov. 20, 2001.
Filed Aug. 1, 2002.

Edward F. Silva, Philadelphia, for appellant.

Frank G. Procyk, Allentown, for appellees.

Howard S. Stevens, Philadelphia, for appellees.

Abbie Newman, Philadelphia, for appellees.

Before DEL SOLE, P.J., CAVANAUGH, JOHNSON, HUDOCK, JOYCE, STEVENS, MUSMANNO, ORIE MELVIN and LALLY–GREEN, JJ.

ORIE MELVIN, J.

¶ 1 Appellant, Rima Yacoub, Administratrix of the estate of her husband, Bashar Yacoub, appeals from the July 19, 2000, judgment entered in favor of Appellees, Margaret S. Tretter, D.O., James T. McNelis, D.O., Lehigh Valley Medical Associates, P.C., Allen Neurosurgical Association, Inc., Zev Elias, M.D. and Lehigh Valley Hospital, in this medical malpractice action. For the following reasons we affirm.

¶ 2 The facts and procedural background of this matter may be summarized as follows. In October of 1994, Bashar Yacoub began experiencing terrible headaches and dizziness. After an initial evaluation at Cedar Crest Emergi–Center, he was referred to Allentown Osteopathic Hospital for a CT scan on October 26, 1994. Dr. Margaret Tretter, an internal medicine practitioner with Lehigh Valley Medical Associates, P.C. (LVMA), examined Mr. Yacoub at the hospital. Dr. Tretter's review of the CT scan revealed a large brain mass, which was thought to be a tumor. On the advice of Dr. Tretter, Mr. Yacoub was transferred to Lehigh Valley Hospital

(LVH) for a MRI and a consultation with a neurologist.

¶ 3 Upon his admission to LVH, Dr. Mark Lester, a neurosurgeon with Allen Neurosurgical Association, Inc. (ANA), examined Mr. Yacoub. Dr. Lester noted that he was awake, alert and conversant. N.T. Trial Volume III, 3/3/00, at 204. At that time the CT scan performed at Allentown Osteopathic Hospital was reviewed, and it was believed that the brain mass was most likely a malignant glioma. *Id.* at 205–206, 226. Dr. Lester did not note the possibility of a brain abscess in his differential diagnosis. On October 27, 1994, a nurse transported Mr. Yacoub via a wheelchair for the MRI in another building on the hospital's campus connected by a causeway. The hospital contracted with Lehigh Magnetic Imaging Center (LMIC) for this service. Dr. Bradford Yeager, a radiologist for LMIC, interpreted the results. Dr. Yeager noted "[a]nalogous to the change as seen on CT," and reported a "lobulated ring enhancing mass in the left temporal lobe measuring approximately 2.7 by 3.7 centimeters in diameter." N.T. Trial Volume VII, 3/9/00, at 125. His impression was "[a] primary glial tumor is felt most likely. Cerebral abscess is possible, but considered less likely." *Id.* at 127.

¶ 4 On October 28, 1994, Dr. Zev Elias, another neurosurgeon with ANA, examined Mr. Yacoub and told him that either a craniotomy or a biopsy should be performed. However, Dr. Elias did not believe the procedure needed to be done on an emergency basis and therefore placed him on his elective surgery schedule for the following week. Further, because Mr. Yacoub wished to leave the hospital Dr. James McNelis, another internist practicing with Dr. Tretter, released him. Dr. McNelis instructed Mr. Yacoub's brother that he should bring him back to the hospital if his condition worsened. Prior to examining Mr. Yacoub, Dr. Elias asserted that he was informed verbally by Dr. Lester about the MRI finding of October 27, 1994. However, Dr. Lester testified that he did not see the MRI film or report until November 2, 1994.

¶ 5 Shortly after his release from the hospital Mr. Yacoub's condition continued to deteriorate. Approximately one hour after discharge, Mr. Yacoub's brother called the number written on the discharge form and asked to speak with Dr. McNelis or Dr. Elias. He was advised that someone would return his call; however, a return call was not forthcoming. He called again the following morning, and a physician still did not return his call. Finally, on October 30th Dr. McNelis called and informed him that there was nothing more that could be done and that he should just continued to give his brother extra pain medication.

¶ 6 In the early morning of November 1, 1994, Mr. Yacoub was taken back to the emergency room of LVH. Another CT scan was ordered. Dr. Mark Osborne, a radiologist, analyzed the CT scan and noted incorrectly that no recent films were available for comparison. Dr. Tretter examined Mr. Yacoub at 10:00 a.m. and indicated to Dr. Elias that she wanted to expedite the biopsy due to the increased headaches. At approximately 12:45 p.m. Dr. Elias reviewed the CT scan and asked for the prior films, but he was told that they were not available. After examining Mr. Yacoub, he noted that apart from worsened headaches, his condition had not changed. On the morning of November 2, 1994 Mr. Yacoub could not be awakened. Upon examination, Dr. Lester found him comatose and requiring emergency surgery. Following surgery it was determined that Mr. Yacoub had a brain abscess rather than a tumor and that the abscess had ruptured into the ventricle

system. Mr. Yacoub died on November 18, 1994 having never regained consciousness.

¶ 7 Appellant subsequently commenced this medical malpractice action alleging that the Appellees were negligent in failing to diagnosis and promptly treat a brain abscess, thereby causing the Mr. Yacoub's death. The trial court precluded Appellant from presenting a claim of ostensible agency against LVH based upon the alleged negligence of two radiologists who interpreted Mr. Yacoub's MRI of October 27, 1994 and CT scan of November 1, 1994. The trial court also found that Appellant's expert, a neurosurgeon, was not qualified to render an opinion regarding the standard of care applicable to doctors of internal medicine or nurse employees of LVH. Absent this expert evidence Appellant could not establish the liability of Drs. Tretter and McNelis and LVMA. Thus, the trial court entered a directed verdict in their favor. Subsequently the jury found Drs. Elias and Lester and ANA, through its employees, negligent but did not find that their negligence was a substantial factor in causing the Mr. Yacoub's death. Since their negligence was not determined to be a substantial factor in Mr. Yacoub's death, the jury never decided the question of whether Drs. Elias and Lester were the ostensible agents of LVH. On March 22, 2000, Appellant filed a Motion for Post–Trial Relief, which was denied on June 28, 2000. Accordingly, the trial court entered judgment in favor of the Appellees on July 19, 2000. Thereafter, Appellant perfected her appeal to this Court. On May 14, 2001 a memorandum decision was filed affirming the judgment with one judge dissenting. Appellant's application for *en banc* review was granted on July 10, 2001.

¶ 8 On appeal Appellant presents the following questions for our review:

I. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN PRECLUDING THE APPELLANT FROM INTRODUCING EVIDENCE THAT THE RADIOLOGISTS, DR. BRUCE YEAGER AND DR. MARK OSBORNE, WERE OSTENSIBLE AGENTS OF APPELLEE LEHIGH VALLEY HOSPITAL AND WERE NEGLIGENT IN INTERPRETING THE STUDIES OF OCTOBER 27, 1994 AND NOVEMBER 1, 1994?

II. WHETHER THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION IN FAILING TO FIND THE VERDICT OF THE JURY WAS AGAINST THE WEIGHT OF THE EVIDENCE WHEN THERE WAS AGREEMENT AMONG THE PARTIES THAT THE FAILURE TO TIMELY DETECT AND TREAT A BRAIN ABSCESS WOULD EFFECTIVELY TERMINATE A PATIENT'S CHANCES OF AVOIDING INJURY?

III. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN PRECLUDING DR. MAURCE [SIC] ROMY, A BOARD CERTIFIED NEUROSURGEON, FROM OPINING AS TO THE STANDARD OF CARE APPLICABLE TO DRS. TRETTER AND McNELIS, AND TO THE NURSE EMPLOYEES OF LEHIGH VALLEY HOSPITAL, ALL OF WHOM WERE PROVIDING HEALTHCARE TO A NEUROSURGICAL PATIENT?

IV. WHETHER THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION IN RESTRICTING APPELLANT'S CROSS EXAMINATION OF APPELLEES' EXPERT, DR. JEWELL OSTERHOLM, WITH RESPECT TO THE FACT THAT APPELLEES' COUNSEL, POST & SCHELL, HAD PREVIOUSLY REP-

RESENTED DR. OSTERHOLM IN MORE THAN FIFTY CASES, AND WITH RESPECT TO THE REPORT OF DR. MARK MISHKIN?

V. WHETHER THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION IN RESTRICTING APPELLANT FROM QUESTIONING HER ACTUARIAL EXPERT, ROYAL BUNIN, ON REDIRECT EXAMINATION WITH RESPECT TO A REPORT OF TIMOTHY BROPHY THAT WAS BROUGHT UP IN CROSS EXAMINATION BY THE APPELLEES?

VI. WHETHER THE TRIAL COURT COMMITTED AN ABUSE OF DISCRETION IN REFUSING APPELLANT'S REQUEST TO DISMISS THE ARRAY OF JURORS ON FEBRUARY 21, 2000, WHEN COUNSEL FOR APPELLEE LEHIGH VALLEY HOSPITAL INCORRECTLY INFORMED THE PANEL THAT THE HOSPITAL WAS A NONPROFIT CHARITABLE ORGANIZATION THAT DID NOT ISSUE BONDS?

Appellant's brief, at 4–5.

■ ¶ 9 Preliminarily, we note our standard of review concerning a trial court's ruling on a motion for new trial is as follows. This Court will not reverse a trial court's decision regarding the grant or refusal of a new trial absent an abuse of discretion or an error of law. *Gunn v. Grossman,* 748 A.2d 1235, 1239 (Pa.Super.2000). The decision to grant a new trial based on a challenge to the weight of the evidence is within the sound discretion of the trial court. *Vattimo v. Eaborn Truck Service, Inc.,* 777 A.2d 1163 (Pa.Super.2001). It is well established that where a jury's verdict is so contrary to the evidence as to shock one's sense of justice the award of a new trial is imperative, so that right may be given another opportunity to prevail. *Id.* However, "[i]t is not

the role of an appellate court to pass on the credibility of witnesses or to act as the trier of fact, and an appellate court will not substitute its judgement for that of the fact-finder." *Id.* at 1165 (citing *Ludmer v. Nernberg,* 433 Pa.Super. 316, 640 A.2d 939 (1994)).

> Further, if the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining party. Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment. *Ratti v. Wheeling Pittsburgh Steel Corp.,* 758 A.2d 695, 707 (Pa.Super.2000) [*appeal denied,* 567 Pa. 715, 785 A.2d 90 (2001)] (quoting *Foflygen v. Allegheny General Hosp.,* 723 A.2d 705 (Pa.Super.1999), appeal denied, 559 Pa. 705, 740 A.2d 233 (1999)).

*Detterline v. D'Ambrosio's Dodge, Inc.,* 763 A.2d 935, 938 (Pa.Super.2000). Keeping this standard in mind, we will now address Appellant's claims.

■ ¶ 10 We begin by addressing Appellant's second issue that she is entitled to a new trial because the verdict was against the weight of the evidence. Appellant asserts that the issue of causation was not contested at trial since the neurosurgeons and their own witnesses testified that once a brain abscess perforates the strong likelihood is death. Consequently, Appellant argues that the jury was without any basis to conclude that the neurosurgeons' negligence was not a substantial factor in causing death. We disagree with the contention that causation was not contested. The only fact conceded by the neurosurgeons was that when an abscess perforates the likely prognosis is death. This is not a concession that any actions or omissions on their part were a substantial factor resulting in Mr. Yacoub's death.

Rather, the neurosurgeons maintained that their diagnosis of a brain tumor was consistent with the symptoms Mr. Yacoub exhibited and lack of risk factors attributable to an abscess.

¶ 11 We would agree with Appellant's argument if the only reasonable conclusion that could be drawn from the jury's finding of negligence was that the neurosurgeons were capable of diagnosing a brain abscess from the information at their disposal and they failed to do so and promptly effectuate appropriate treatment. However, Appellant made numerous allegations of negligence, and we are here dealing with a general verdict rather than answers to written jury interrogatories delineating each of Appellant's allegations of negligence. Under these circumstances the jury could have reasonably concluded that the doctors were negligent in one regard, for instance in not following proper procedures by procuring and comparing all available film studies of Mr. Yacoub's brain, and nonetheless determined that this failure was not a substantial cause of death. This is a viable and legally supportable conclusion in light of the fact evidence was presented that even upon comparison of the film studies a definitive distinction between a tumor and abscess would not be revealed, and, therefore no different course of action would have been taken.

¶ 12 Furthermore, the evidence revealed that Mr. Yacoub did not present at the time of any of the examinations with any of the warning signs or risk factors typically associated with a brain abscess. Specifically, Dr. Elias testified that patients suffering from brain abscesses generally have certain risk factors, which include a penetrating head injury, such as a bullet wound or a trauma, brain surgery or patients suffering from a systemic infection or an infection in another part of the body.

N.T. Volume IV, 3/6/00, at 87. Typically, patients presenting with abscesses have had their immune system compromised in some fashion, such as a patient who has had an organ transplant, AIDS, diabetes, or is on renal dialysis. *Id.* Instantly, Mr. Yacoub did not present with any of these risk factors. *Id.* at 87, 116–117. There was also testimony that the probability of the lesion being a tumor was in excess of ninety-nine (99%) percent. *Id.* at 117. Moreover, Jewell L. Osterholm, M.D. testified that a side by side comparison of the October 26, 1994 and November 1, 1994 films demonstrated only a small increase in the size of the mass and that such a finding is consistent with the diagnosis of a brain tumor. N.T. Volume VII, 3/9/00, at 181. Thus, as to the ultimate factual finding regarding the propriety of the diagnosis it was well within the province of the jury to conclude that Mr. Yacoub's clinical presentation was consistent with the diagnosis of a brain tumor, which did not require emergency intervention. Since the jury was free to accept the defendants' evidence, we cannot definitively ascertain whether or not the jury's finding of negligence represents an acceptance or rejection of the doctors' defense of their diagnosis. Viewed in this context, we cannot say that the verdict shocks our sense of justice. Accordingly, the trial court did not abuse its discretion in denying a new trial.

¶ 13 Next, we address Appellant's claim that she was erroneously precluded from presenting evidence establishing that the radiologists were the ostensible agents of LVH and that they were negligent in interpreting the October 27, 1994, MRI and the November 1, 1994, CT scan. In response to a motion *in limine* filed by LVH, the trial court precluded this claim on the basis that Appellant's complaint lacked specificity with respect to Drs. Yeager and Osborne being the ostensible agents of LVH.

¶ 14 "When reviewing rulings on motions *in limine,* we apply the scope of review appropriate to the particular evidentiary matter." *Delpopolo v. Nemetz,* 710 A.2d 92, 94 (Pa.Super.1998). " 'A motion *in limine* is a procedure for obtaining a ruling on the admissibility of evidence prior to or during trial, but before the evidence has been offered.' " *Id.* (quoting *Meridian Oil & Gas Enters., Inc. v. Penn Cent. Corp.,* 418 Pa.Super. 231, 614 A.2d 246, 250 (1992)), *appeal denied,* 534 Pa. 649, 627 A.2d 180 (1993). In reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law. *Kehr Packages, Inc. v. Fidelity Bank,* 710 A.2d 1169, 1172 (Pa.Super.1998). "Further, if the basis of the request for a new trial is the trial court's rulings on evidence, then such rulings must be shown to have been not only erroneous but also harmful to the complaining party." *Ratti v. Wheeling Pittsburgh Steel Corp.,* 758 A.2d 695, 707 (Pa.Super.2000) (quoting *Foflygen v. Allegheny General Hospital,* 723 A.2d 705 (Pa.Super.1999), *appeal denied,* 559 Pa. 705, 740 A.2d 233 (1999)).

¶ 15 In support of its motion, LVH argued that the specificity of the complaint with respect to the other defendants tells us that. if the Appellant had wanted to establish an ostensible agency relationship with the radiologists and Lehigh Valley Hospital, then she would have done so as with the ostensible agency allegations contained in paragraphs 9, 11, 13, 14, 15, 16, 17, and 18 of Appellant's Fourth Amended Complaint. In granting the motion *in limine* the trial court accepted LVH's argument, stating:

> Unlike the clear and specific language found in the paragraphs [relating to the other defendants and LVH], the Fourth Amended Complaint failed to set forth

an ostensible agency relationship relative to the radiologists and Lehigh Valley Hospital. Therefore, this Court used its common sense and concluded that had the Plaintiff intended to allege an ostensible agency relationship between Lehigh Valley Hospital and the radiologists, the same specific language and pleading would have been embodied within the Complaint.

Trial Court Opinion, 6/28/00, at 16. While we agree that Appellant could have identified the alleged ostensible agents of LVH, we disagree that such specificity was necessary in this case to raise a vicarious liability claim against LVH based on the actions of the radiologists.

¶ 16 The purpose of the pleadings is to place the defendants on notice of the claims upon which they will have to defend. *McClellan v. Health Maintenance Organization of Pennsylvania,* 413 Pa.Super. 128, 604 A.2d 1053 (1992), *appeal denied,* 532 Pa. 664, 616 A.2d 985 (1992). A complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims. *Id.;* Pa.R.C.P. 1019(a), 42 Pa.C.S.A. Here, the trial court only focused on the following contested portion of Appellant's complaint:

> 19. All of the acts alleged to have been done or not to have been done by defendant, Lehigh Valley Hospital, Inc., were done or not done by said defendant, its agents, ostensible agents, servants, workmen and/or employees, acting in the course and scope of their employment with and on behalf of said defendant.

Certified Record at 83, Fourth Amended Complaint, at ¶ 19.

¶ 17 The trial court found this language was not sufficiently specific because plaintiff failed to name the alleged ostensible agents as she had in the preceding

paragraphs.[1] However, it is not enough to focus upon one portion of the complaint. Rather, in determining whether a particular paragraph in a complaint has been stated with the necessary specificity, such paragraph must be read in context with all other allegations in that complaint. Only then can the court determine whether the defendant has been put upon adequate notice of the claim against which he must defend. *See Smith v. Wagner*, 403 Pa.Super. 316, 588 A.2d 1308, 1310 (1991) (stating that "when one wades through the sea of information contained in Smith's complaint, it is possible to find concealed therein a legally cognizable cause of action.").

¶ 18 Notably, the following allegations of negligence, in relevant part, were asserted against LVH:

32. The negligence, carelessness and malpractice of defendants, Lehigh Valley Hospital, Inc., consisted of the following:

(j) Failing to recognize that there was a curable abscess of the brain;

(m) Failing to read the MRI films so as to determine that there was the possibility of a transtentorial herniation;

(n) Failing to recognize that there could be a transtentorial herniation;

(r) Failing to recognize that there was a potentially explosive danger in respect to the brain abscess;

(t) Failing to timely and properly diagnose the left temporal brain abscess

with surrounding edema afflicting plaintiff's decedent;

(y) In respect to the MRI of October 27, 1994, failing to see an abscess and the possibility of a transtentorial herniation;

(z) In respect to the MRI of October 27, 1994, failing to record an abscess and the possibility of a transtentorial herniation;

(aa) **In respect to the MRI of October 27, 1994, failing to impart to the neurosurgeons and other treating physicians that there was an abscess and the possibility of a transtentorial herniation so that immediate action could be taken.**

Certified Record at 83, Fourth Amended Complaint, at ¶ 32. These allegations can clearly be read as calling into question the hospital's conduct through its radiology department. Thus, when paragraph 19 is read in context with the other allegations, especially paragraphs 32(m), (y), (z) and (aa), we find the complaint sufficiently put LVH upon adequate notice of the claim against which it must defend.

¶ 19 Moreover, if LVH did not know from the Fourth Amended Complaint who its ostensible agents were it could have filed another preliminary objection in the nature of a request for a more specific pleading or moved to strike that portion of Appellant's complaint. LVH did neither and thus apparently understood the allegations of Appellant's Fourth Amended Complaint well enough to simply deny it in its

---

1. For example, Paragraph 18 provides:

All of the acts alleged to have been done or not to have been done by defendant, Lehigh Valley Medical Associates, P.C. [the Tretter Group], were done or not done by said defendant, its agents, **ostensible agents,** servants, workmen and/or employees, acting in the course and scope of their employment with and on behalf of said defendant. The agents, **ostensible agents,** servants, workmen and/or employees **are** Margarete S. Tretter, D.O.,

James T. McNelis, D.O., Dr. Hieu Ngo, Dr. Zev Elias, Dr. Mark C. Lester, Dr. John McCarthy, Dr. Bradford Yeager, Dr. Mark Osbome or other doctor responsible for **reading the CT scan performed** at Lehigh Valley Hospital at 7:45 a.m. on November 1, 1994 including the person who verified it with the initials JAN.

Certified Record at 83, Fourth Amended Complaint, at ¶ 18 (emphasis added).

answer. Rather than timely calling the alleged lack of specificity to the trial court's attention, and thereby allowing the Appellant the opportunity to file an amendment, LVH waited until the eve of trial to contest the specificity of the Fourth Amended Complaint. Under these circumstances any objection to the specificity of the complaint has been waived. *See Arner v. Sokol,* 373 Pa. 587, 592–93, 96 A.2d 854, 856 (1953) (quoting *King v. Brillhart,* 271 Pa. 301, 114 A. 515, 516 (1921)) (stating "[T]he [plaintiff's statement] may not be such a statement, in a concise and summary form, of the material facts upon which the plaintiff relies ...; but, if not, it was waived by defendant's [answer] to and going to trial upon the merits.... [A] defendant may move to strike off an insufficient statement, or, if it is too indefinite, may obtain a rule for one more specific. Failing to do either, he will not be entitled to a compulsory nonsuit because of the general character of plaintiff's statement."). Further, at the time of this motion *in limine* depositions were concluded and the Appellant's radiology expert had filed his report opining that Drs. Yeager and Osborne were negligent. Since the radiologists were not named as parties it should have been readily apparent that their conduct was only being called into question to support a vicarious liability theory. Thus, LVH cannot now claim that it was surprised to find out that Appellant intended to claim that the radiologists were its ostensible agents.

¶ 20 Alternatively, the trial court reasoned that the "evidence developed at trial would not have supported [Appellant's] allegation that [Appellant and her husband] relied on the abilities of Lehigh Valley Hospital and looked to the defendant hospital for care. Furthermore, Defendant Lehigh Valley Hospital did not hold the radiologists out as its employees." Trial Court Opinion, 6/28/00, at 17. We find this rationale is misplaced.

¶ 21 The record reflects the following in chambers colloquy:

MR. FEINBERG: And I think—and I heard some other talk here yesterday, which may be that I'm not interpreting correctly some of your rulings, I think you have ruled that the radiologists are not to be considered as the ostensible agents of any of the parties. Is that correct, Judge?

THE COURT: That was my understanding as well.

MR. NACE: Yes.

MR. PROCYK: Yes, that's my understanding of the Court's ruling.

MR. STEVENS: Yes.

THE COURT: That's exactly what my understanding was.

MR. FEINBERG: So that based on that ruling [Dr. Piwoz] is not going to testify as to the standard of care of the radiologists?

THE COURT: That's correct.

N.T. Volume VII, 3/9/00, at 4–5. Therefore, the trial court cannot say that there were insufficient facts from which a jury could conclude that an ostensible agency relationship existed when its pre-trial rulings precluded the Appellant from going forward with any ostensible agency claim relative to the radiologists. After review of the pleadings, we find Appellant has satisfied her burden to plead ample facts to support her claim of ostensible agency. Accordingly, the trial court abused its discretion in precluding Appellant from establishing an ostensible agency theory of liability.

¶ 22 Nonetheless, we further find that this error did not affect the verdict and was therefore harmless. *Ratti, supra; see also, Aldridge v. Edmunds,* 561 Pa. 323, 750 A.2d 292 (2000) (holding that

an erroneous ruling will only require the grant of a new trial if it was harmful or caused prejudice). Under the doctrine of ostensible agency a hospital may be held liable for the negligent acts or omissions of independent physicians. The relevant factors in establishing an ostensible agency are: "(1) whether the patient looks to the institution, rather than the individual physician for care and (2) whether the hospital 'holds out' the physician as its employee." *Goldberg v. Isdaner,* 780 A.2d 654, 660 (Pa.Super.2001) (citing *McClellan v. HMO,* 413 Pa.Super. 128, 604 A.2d 1053, 1057 (1992)). "A holding out occurs 'when the hospital acts or omits to act in some way which leads the patient to a reasonable belief he is being treated by the hospital or one of its employees.'" *Id.* (quoting *Capan v. Divine Providence Hospital,* 287 Pa.Super. 364, 430 A.2d 647, 649 (1980)). Given the facts of this case, in order to impute liability to LVH, Appellant would have had to not only show that the radiologists were LVH's ostensible agents, they would have also been required to establish that the radiologists were negligent in reading the films and that such negligence contributed to the neurosurgeons making a faulty diagnosis. As we have already discussed, there was evidence, which the jury was free to believe and apparently did, that the neurosurgeons' own reading of these same film studies would not have altered their course of treatment. Moreover, even if the radiologists had concluded that the mass was more likely an abscess there is no evidence that the neurosurgeons would have relied on the radiologists' interpretation rather than their own interpretation. Since it was ultimately the neurosurgeons' call as to the proper diagnosis and the jury found their conduct was not a substantial factor in causing Appellant's harm, any negligence that Appellant was precluded from establishing with respect to the radiologists could not have affected the jury's determination of causation.

¶ 23 Appellant next claims it was error to preclude Dr. Romy from opining as to the internists and nurses deviating from the applicable standard of care. In order to meet her burden of proof, Appellant was required to provide expert testimony to establish, to a reasonably degree of medical certainty, that the acts of the internists and nurses deviated from acceptable medical standards and that such deviation was a proximate cause of the harm suffered. *Gregorio v. Zeluck,* 451 Pa.Super. 154, 678 A.2d 810 (1996), *appeal denied,* 546 Pa. 681, 686 A.2d 1311 (1996). Determining whether a witness may testify as an expert is a matter within the sound discretion of the trial court, whose decision will only be reversed for a clear abuse of discretion. *Flanagan v. Labe,* 547 Pa. 254, 690 A.2d 183 (1997). In order to qualify as an expert in a given field, a witness must possess more expertise than is within the ordinary range of training, knowledge, intelligence, or experience. *Bennett v. Graham,* 552 Pa. 205, 209, 714 A.2d 393, 395 (1998). "The test to be applied when qualifying a witness to testify as an expert witness is whether the witness has **any reasonable pretension to specialized knowledge on the subject under investigation.**" *Whittington v. Episcopal Hosp.,* 768 A.2d 1144 (Pa.Super.2001) (quoting *Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 481, 664 A.2d 525, 528 (1995)). If a witness possesses neither experience nor education in the subject matter under investigation, the witness should be found not to qualify as an expert. *Dierolf v. Slade,* 399 Pa.Super. 9, 581 A.2d 649, 651 (1990).

¶ 24 An examination of Dr. Romy's curriculum and his own *voir dire* testimony shows the following: Dr. Romy

was a board certified neurosurgeon and was therefore accepted as an expert in the area of neurosurgery and the standard of care of a neurosurgeon. For the last several years his subspecialty was the spine. In recent years, he opened a number of clinics and rarely practiced in a hospital setting. In fact he could not remember the last time he interacted with nurses working in a Special Care Unit. Dr. Romy never published anything regarding nursing. Similarly, his only interaction with doctors of internal medicine was in the context of referring patients. Dr. Romy never practiced or became certified in internal medicine, and he did not regularly read journals on this topic. The only experience relative to internal medicine was from 1973 to 1976 when he "moonlighted" in the Emergency Room during his residency at the Cleveland Clinic. While we recognize that experts in one field of medicine may be found qualified to address other areas of specialization where the specialties overlap in practice or the specialist has had experience in a related field of medicine, *Estate of Pew*, 409 Pa.Super. 417, 598 A.2d 65 (1991), *appeal denied*, 530 Pa. 645, 607 A.2d 255 (1992), we find that the Appellant failed to lay a proper foundation to qualify Dr. Romy based on overlap or experience in internal medicine or Special Care Unit nursing. Accordingly, the trial judge did not abuse his discretion in precluding Dr. Romy from opining as to the applicable standards of care in these fields of medicine.

¶ 25 Appellant next claims that she was wrongfully prevented from exploring a personal relationship between the neurosurgeons' expert, Dr. Jewell Osterholm, and the law firm that was representing the neurosurgeons. We disagree.

¶ 26 During cross-examination Appellant's counsel asked Dr. Osterholm if he was familiar with the law firm of Post &

Schell, P.C. N.T. Volume VII, 3/9/00, at 150–51. Dr. Osterholm acknowledged that he was well familiar with the firm. *Id.* Counsel then stated "[as] a matter of fact they represented you in more than 50 matters over the years, isn't that true?" *Id.* at 151. An objection was raised and sustained. *Id.* at 151–52. Nonetheless, counsel continued as follows:

Q. You have been involved with the law firm of Post & Schell over the years, in many matters, is that true?

A. In a few.

Q. Well, it's more than a few, isn't it, Doctor?

A. No, I could elaborate them if you like.

Q. Haven't you been involved with that law firm over the years in at least 50 matters?

*Id.* at 152–53. Whereupon another objection was raised and sustained.

¶ 27 The scope of cross-examination is within the sound discretion of the trial court, and we will not reverse the trial court's exercise of discretion in absence of an abuse of that discretion. *Collins v. Cooper*, 746 A.2d 615, 617 (Pa.Super.2000). We acknowledge that an expert witness can be cross-examined as to any facts that tend to show partiality on the part of the expert, and that examination may include a prior relationship with a party's counsel. *Tiburzio–Kelly v. Montgomery*, 452 Pa.Super. 158, 681 A.2d 757 (1996). However, such cross-examination has limits. *See General Equipment Mfrs. v. Westfield Ins. Co.*, 430 Pa.Super. 526, 635 A.2d 173 (1993) (stating: "[i]n setting limits on cross-examination, the trial court may consider whether the cross-examination would be likely to confuse or mislead the jury."). As with any other type of evidence, to be

admissible, it must be relevant and also not unfairly prejudicial. *See* Pa.R.E. 403[2].

¶ 28 Here, Appellant was permitted to show that Dr. Osterholm had previous involvement with counsel for the neurosurgeons. The trial court merely restricted Appellant from asking about the total number of matters in which Post & Schell represented Dr. Osterholm. The trial court found that such testimony would improperly imply that Dr. Osterholm had been represented "in at least 50" medical malpractice actions. Since Appellant was afforded the opportunity to cross-examine Dr. Osterholm regarding Post & Schell's representation but was merely limited in questioning him in a way that implied malpractice representation, we find the trial court did not abuse its discretion.

■ ¶ 29 Appellant also argues that the trial court erred in restricting the cross-examination of Dr. Osterholm regarding a report written by Dr. Mark Mishkin, an expert retained by the Appellees but who was not called to testify. Appellant claims that the door was opened to cross-examination concerning Dr. Mishkin's report when Appellees' counsel asked another witness if he knew of Dr. Mishkin even though the witness made no reference to the report. We find Appellant's argument is misplaced.

¶ 30 Appellant cites *Commonwealth v. Thomas*, 444 Pa. 436, 282 A.2d 693 (1971), *Primavera v. Celotex Corp.*, 415 Pa.Super. 41, 608 A.2d 515 (1992), and *Cohen v. Albert Einstein Med. Ctr.*, 405 Pa.Super. 392, 592 A.2d 720 (1991), for the proposition that "medical experts are permitted to express opinions which are based, in part, upon reports which are not in evidence, but which are customarily relied upon by experts in the practice of the profession." *Primavera*, 608 A.2d at 518. Appellant correctly states the proposition, however, it has no application to Dr. Osterholm's testimony in this case. Our review indicates Dr. Osterholm never testified that he relied on Dr. Mishkin's report in rendering his medical opinion. Moreover, Dr. Mishkin is a radiology expert, and his report is not the type of medical record that Dr. Osterholm, an expert in neurology, would customarily rely upon in formulating his opinion concerning the neurosurgeons' conduct. Accordingly, the trial court did not commit an error of law or abuse its discretion in restricting Appellant's cross-examination of Dr. Osterholm with respect to the pre-trial report of Dr. Mishkin.

■ ¶ 31 Appellant makes a similar claim with respect to the trial court's decision to restrict her redirect examination of her actuarial expert. Appellant presented expert-actuarial testimony from Mr. Royal Bunin. On cross-examination, Mr Bunin was asked:

Q. What other information were you given?

A. A vocational report from an individual by the name of ... Timothy Brophy [sic][3], vocational consultation services.

N.T. Volume VIII, 3/10/00, at 116. This was the extent of the questioning regarding the report by Timothy Bruffey, who was identified as a defense vocational expert. Neither Mr. Bunin, nor Appellees'

2. Rule 403, provides: "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence."

3. In their pre-trial memorandum, Appellees Drs. Tretter and McNelis and LVMA indicate that the proper spelling of their vocational expert's name is Timothy Bruffey. C.R. at 107. Therefore, we will use the proper spelling hereinafter.

counsel introduced information from the report into evidence. On redirect, Appellant's counsel began questioning Mr. Bunin regarding the report of Mr. Bruffey to which objections were raised. During side-bar conference the trial court was made aware that Mr. Bruffey was not going to be called as a witness; nothing from the report was entered into evidence, and the witness did not say that he relied on it to form his opinion. The trial court thereafter sustained the objection. For the same reasons expressed with respect to the report of Dr. Mishkin, we find no error or abuse of discretion. Furthermore, in light of the jury's determination that a causal nexus was lacking the question of damages was not reached. Thus, even if there was error it was harmless.

¶ 32 Finally, Appellant takes issue with the trial court's refusal to dismiss the jury venire based upon a misstatement made by LVH's counsel that the hospital did not issues bonds. During *voir dire* LVH's counsel mistakenly told the jury venire that LVH was a charitable non-profit organization without shares that did not issue bonds when in fact it did issue bonds. After being apprised of the misstatement, the trial court ordered counsel for LVH to go before the venire and correct his mistake. The Trial Court then allowed Appellant's counsel to question the jury panel to determine any prejudice. Appellant argues that she was prejudiced since the jury may have thought that a charitable organization has no money to pay a judgment or that awarding a judgment would take money away from a charity. We find this contention lacks merit.

¶ 33 Our standard of review is as follows:

> In reviewing a trial court's action regarding jury selection, great deference is afforded to the trial judge, who 'is in the best position to assess the credibility of the jurors and their ability to be impartial.' *Commonwealth v. Impellizzeri*, 443 Pa.Super. 296 [661 A.2d 422, 427 (1995)]. [The trial court's] determination ... will not be reversed absent a 'palpable abuse of discretion.' *Commonwealth v. Marshall*, 534 Pa. 488, 497, 633 A.2d 1100, 1104 (1993).

*Commonwealth v. Blasioli*, 454 Pa.Super. 207, 685 A.2d 151, 159 (1996), *affirmed*, 552 Pa. 149, 713 A.2d 1117 (1998). Instantly, the trial court instructed counsel to correct his statement and permitted Appellant's counsel the opportunity to inquiry into whether any of the jurors held bonds from LVH or whether any held the belief that a charitable non-profit organization did not have money to pay for claims. Accordingly, we find no abuse of discretion in the trial court's determination that the jurors' ability to render an impartial judgment was not compromised.

¶ 34 Judgment affirmed.

HUDOCK, STEVENS, LALLY-GREEN, and CAVANAUGH, JJ., join the majority.

DEL SOLE, P.J., files a Dissenting Opinion which is joined by JOHNSON, JOYCE, and MUSMANNO, JJ.

MUSMANNO, J. files a Dissenting Opinion which is joined by DEL SOLE, P.J., JOHNSON, and JOYCE, JJ.

Dissenting opinion by DEL SOLE, P.J.

¶ 1 While I agree with the Majority's ruling that Appellant has pled sufficient facts to support her claim of ostensible agency and the trial court erred in precluding her from establishing this theory of liability, I cannot agree that this error may not have had an effect on the jury's verdict.

¶ 2 Appellant sought to present a claim of ostensible agency against LVH based

upon the alleged negligence of Drs. Bruce Yeager and Mark Osborne, radiologists who interpreted the October 27, 1994, and November 1, 1994, CT scan performed on Mr. Yacoub. The Majority writes that the trial court's erroneous limitation on Appellant's ability to present this claim was harmless error because the neurosurgeons' own reading of these same films "would not have altered their course of treatment" and it was ultimately the neurosurgeons' call as to the proper diagnosis. Majority Opinion at 18. The Majority states "Moreover, even if the radiologists had concluded that the mass was more likely an abscess there is no evidence that the neurosurgeons would have relied on the radiologists' interpretation rather than their own interpretation." *Id.* In my view, common sense dictates that had the neurosurgeons been alerted by a radiologist's report that the CT films disclosed the likelihood of an abscess, the neurosurgeons would have utilized this information when making their own interpretation. There is nothing to suggest that the neurosurgeons routinely ignore radiology reports and rely solely on their own interpretation of CT films. Thus, I cannot agree with the Majority that the negligence on the part of the radiologists which Appellant was precluded from establishing "could not have affected the jury's determination of causation." Majority Opinion at 19.

¶ 3 Secondly, I disagree with the Majority's conclusion that the trial court did not err when it precluded Dr. Romy, a neurosurgeon, from opining regarding the standard of care applicable to internal medicine physicians or special care nurses. The Majority finds that Appellant failed to lay a proper foundation to qualify Dr. Romy based either on his experience or an overlap of his field with their related fields of medicine.

¶ 4 Dr. Romy, a board-certified neurosurgeon, was questioned about his neurosurgical background and his knowledge regarding the standard of care for doctors in other specialties who care for a neurosurgical patient. He advised the court that he was knowledgeable regarding the standard of care for any doctor who undertakes the care and treatment for a patient who has a brain tumor or a brain abscess. N.T., 3/7/00, at 26. Dr. Romy testified that he was knowledgeable as to the skills doctors in other specialties must possess in order to care for a neurosurgical patient and that there are differences in the standard of care between an internal medicine doctor and a neurosurgeon when treating a brain case. *Id.* at 25. When asked what the standard of care was for an internal medicine doctor who undertakes to manage and care for a person with a brain tumor or a brain abscess, an objection was lodged. The court sustained the objection, finding that the questioning was moving away from an examination of qualifications into the standard of care. *Id.*

¶ 5 With respect to Dr. Romy's expertise regarding nursing care, he testified that he was very familiar with the job duties of nurses who care for a neurosurgical patient with a brain tumor or abscess and with their standard of care. *Id.* at 26. In *Taylor v. Spencer Hospital,* 222 Pa.Super. 17, 292 A.2d 449 (1972), this Court considered whether the trial court committed reversible error where it refused to permit a physician to testify as to the standard of care for nurses treating a patient. The Superior Court held that the doctor was a qualified expert and stated:

> It is evident that the nurses in the instant case made decisions involving the medical treatment of [the plaintiff], and that these decisions were not uniquely administrative or outside the knowledge of a medical doctor. All areas of medical expertise within the knowledge of

596

nurses are also within the knowledge of medical doctors. This issue has never been considered or decided before in Pennsylvania, but our Supreme Court has, by implication, approved the use of the testimony of a medical doctor to establish acceptable standards of nursing care. *Baur v. Mesta Machine Co.,* 405 Pa. 617, 176 A.2d 684 (1961).

*Id.* 452–453.

¶ 6 In *Chanthavong v. Tran,* 452 Pa.Super. 378, 682 A.2d 334 (1996), the plaintiff sought to admit the expert testimony of a board certified general practitioner regarding the condition of his spine and the subsequent treatment necessary to treat this injury. The trial court found that the general practitioner did not possess the necessary qualifications to offer his expert opinion on these matters. Upon review the Superior Court noted that the doctor regularly received CAT scan reports and used them in the course and scope of his treatment of patients. This Court ruled that the combination of his training and experience with patients who had sustained personal injuries qualified him to aid the jury in its deliberations. As has been noted by this Court:

> Different doctors will have different qualifications, some doctors being more qualified than others to testify about certain medical practices. It is, however, for the jury to determine the weight to be given to expert testimony, in light of the qualifications shown by the expert witness.

*Bindschusz v. Phillips,* 771 A.2d 803 (Pa.Super.2001) (quoting *Taylor v. Spencer Hospital,* 292 A.2d at 453 n. 2).

¶ 7 Appellant's proposed expert, Dr. Romy, had been a board-certified neurosurgeon since 1980. His training enabled him to address cranial problems, spinal problems, disc problems and nerves in the body, which training enabled him to know

the skills necessary to be possessed by doctors in other specialties. N.T., 3/7/00, at 24. He testified as to his experience and education regarding the reading of CAT scans and MRIs and noted that he integrated the scanners in his usual practice of medicine where it involved the head or spine. *Id.* at 22. Dr. Romy testified that although he did not keep current generally on medical literature regarding internal medicine, he did so when this literature had importance for a neurosurgeon and concerned the basic core of brain surgery. *Id.* at 32.

¶ 8 Based upon Dr. Romy's background and education as presented, I believe the trial court abused its discretion in refusing to permit him to testify as an expert on the standard of care to be used by internal medicine physicians and special care nurses. Had such testimony been permitted, it would then be for the jury to weigh this testimony in light of all the testimony offered at trial.

¶ 9 Accordingly, I would vacate the judgments entered in favor of the Appellees and remand for a new trial involving all parties.

Dissenting opinion by MUSMANNO, J.

¶ 1 I join the dissent filed by my esteemed colleague, President Judge Del Sole. I also write separately to state my dissent to the Majority's resolution of Appellant's claim related to the restriction on the cross-examination of Dr. Osterholm.

¶ 2 At trial, Appellant sought to introduce evidence of partiality and bias by Appellees' expert witness, Dr. Osterholm. However, the trial court sustained Appellees' objection to a question regarding the number of cases in which Dr. Osterholm had been represented by Appellees' law firm, Post and Schell. On appeal, Appellant challenged this ruling.

¶ 3 The Majority concludes that the trial court did not abuse its discretion in limiting the cross-examination of Dr. Osterholm. In this regard, the Majority states that Appellant was "merely limited in questioning [Dr. Osterholm] in a way that implied malpractice representation[.]" Slip Opinion at 23. However, the trial court's ruling precluded any evidence as to the extensive nature of Dr. Osterholm's involvement with Appellees' law firm.

¶ 4 At trial, Appellant sought to cross-examine Dr. Osterholm regarding the total number of matters in which the law firm of Post & Schell represented Dr. Osterholm. Upon Appellees' objection, the parties discussed the admissibility of this evidence at sidebar, and the following discourse transpired:

[Appellees' counsel]: I said I object to that question. I think that's entirely inappropriate.

THE COURT: What is the relevancy?

[Appellant's counsel]: It shows there is a closeness of this doctor to the law firm of Post and Schell. I have proof with me in court, that they have represented him in 51 matters.

THE COURT: There is a closeness. How is that relevant, I'm not following you?

[Appellant's counsel]: It shows as to his impartiality and motivation.

[Appellees' counsel]: Your Honor, the purpose of what he is trying to do is show that this guy has been sued 51 times.

[Appellant's counsel]: I didn't say he was sued, I said they represented you in more than 50 matters.

N.T., 3/9/00, at 151–52. The trial court sustained defense counsel's objection. *Id.* at 152.

¶ 5 Following this discussion, Appellant's counsel asked whether Dr. Osterholm had been involved with Post & Schell "over the years, in many matters" to which Dr. Osterholm replied "a few." *Id.* at 152–53. When Appellant's counsel attempted to probe Dr. Osterholm's response of "a few," the trial court sustained Appellees' objection. *Id.* at 153.

¶ 6 Thus, the trial court did not merely limit questioning that would imply previous malpractice suits against Dr. Osterholm, but it precluded *any* evidence regarding potential bias resulting from Dr. Osterholm's extensive involvement with Post & Schell, and precluded Appellant's impeachment of Dr. Osterholm's statement that they had been involved in "a few" matters.

¶ 7 "A trial judge has considerable latitude in determining the scope of cross-examination and his determination will not be reversed in the absence of an abuse of discretion unless a party suffers an obvious disadvantage." *Steinhouse v. Herman Miller, Inc.,* 443 Pa.Super. 395, 661 A.2d 1379, 1384 (1995). However, a party is entitled to cross-examine an expert witness to explore the credibility of the witness and to inquire into any potential bias, interest or relationship, which could [a]ffect the testimony of the witness. *Spino v. John S. Tilley Ladder Co.,* 448 Pa.Super. 327, 671 A.2d 726, 738 (1996).

¶ 8 It is permissible to impeach an expert witness by demonstrating that he or she has partiality to a party for whom he or she is testifying. *Brady by Brady v. Ballay, Thornton, Maloney Med. Assocs.,* 704 A.2d 1076, 1083 (Pa.Super.1997). Moreover, the professional relationship between experts and defense attorneys, beyond the confines of a present case, may be the proper subject of cross-examination. *Id.*

¶ 9 The present case turned upon the credibility of the expert witnesses. These

experts testified regarding whether the Appellees were liable for failing to diagnose and treat Mr. Yacoub's brain abscess, thereby causing his death. I believe that evidence of the extensive nature of the relationship between Dr. Osterholm and Post & Schell was admissible as evidence of partiality and bias, and that its preclusion constituted error. Moreover, because this case involved a "battle of the experts," I cannot conclude that this error was harmless. I therefore dissent from the Majority's holding on this issue, as well as those cited in President Judge Del Sole's Dissenting Opinion.